W. F. BRAMEL'S ADM'R, ET AL., v. JAMES H. BRAMEL, ET AL.

**Mental Capacity—Deeds and Gifts.**

> A parent has the absolute right in disposing of his property to give to some of his children all of it and to others nothing, but when he is old and infirm and not able to understand or comprehend how he is disposing of his property, such facts may turn the scale and establish his mental incapacity to dispose of his property.

APPEAL FROM FLEMING CIRCUIT COURT.

February 23, 1876.

OPINION BY JUDGE COFER:

The two deeds executed by W. F. Bramel on the 27th of January, 1870, embraced all his estate of every description, except one note on W. T. & J. A. Bramel for about $950, one on Dixon for about $460, and one on Taylor for $325, and an old hearse, a few cabinet maker's tools, and a small lot of lumber, the last three items estimated by the appellant at $50.

W. T. & James A. now claim $500 of the $950 note belonged to one of them, and that their father gave them the balance of that note and the $460 note on Dixon, and the note on Taylor as well as the hearse, tools and lumber.

Before making the deeds and these alleged gifts, W. F. Bramel had property worth over $4,000, and was indebted only a little more than $500. He had five children, two sons and three daughters. For some years before his death the sons had used a part of his farm and do not appear, at least for a portion of the time, to have paid any rent; they seem to have transacted their father's business mainly, and to have collected debts due to him, and to have kept his accounts and made settlements with those having dealings with him. On the night before the deeds were made they went to the house of Dixon, where their father had been living a great portion of the time after he ceased, in 1867, to keep house, and on that occasion Dixon executed the note for $460. W. F. Bramel was then in quite feeble health, but on the next day he was taken by one of his sons to the house of Taylor, some miles distant. Dixon swears that he went reluctantly and cried on leaving his house and said he was unable to go; some of the members of the family of Taylor swear that when he reached their house he was greatly prostrated and suffered severely, and they had serious apprehensions that he would not live until morning.

One of the sons accompanied the old man to Taylor's, and the other went at his instance, as both swear, to procure the draftsman who wrote the deeds. No reason is assigned for removing the father from the home of his daughter. Nor does it appear that she or her husband had any intimation that conveyances were to be made or that they had ever been informed that he had any such purpose in view at any time. The draftsman and the father-in-law of James A. Bramel arrived at Taylor's the next day, and the deeds were drawn and one of the notes was assigned, and an indorsement made on the $950 note that $500 of it belonged to James, and assigning the residue to him and William. Taylor was the brother-in-law of W. F. Bramel, and as other facts in the record show he and his family were on the most intimate terms with the old man; yet they seem not to have known anything of the nature of the writing being drawn, and to have been ignorant of their character for some time afterwards.

The old man remained at Taylor's from the time the deeds were executed until in July, when he was removed to the house of the

father-in-law of James, where he died in the following September. At the time the deeds were made Dixon resided in Flemingsburg, the county seat af Fleming county, and where, we may safely presume, a draftsman could have been procured and the deeds acknowledged, but the old gentleman in his feeble condition was removed to the county of Mason, and we may assume that a clerk was sent for to take and certify the acknowledgment. No reason is assigned why the deeds were not drawn and executed at Dixon's, or why their intended execution was made known to the other children.

There is a large amount of evidence respecting the mental and physical condition of W. F. Bramel at that time. All the witnesses agree that he was much emaciated and extremely feeble, and Taylor and his wife and other members of Taylor's family, as well as many other witnesses, swear that his mind was so impaired that he was incapable of taking a survey of his estate and of disposing of it according to a fixed plan of his own; while many others say he was competent to do so, and some say his mind was as good as it ever had been. From the statements of the witnesses as to his mental condition it would be difficult to decide whether he had such capacity as to enable him to make a valid disposition of his estate. But when the evidence bearing directly upon that point is considered in connection with other evidence in the record, we have felt no hesitation in coming to a conclusion.

His removal from his accustomed home in the house of his son-in-law and daughter in Flemingsburg, where a draftsman could doubtless have been had, and where the deeds could have been acknowledged, to the county where a draftsman and clerk had to be sent for at some distance, the concealment from his daughter of the fact that the conveyances were to be made, and the condition of the grantor at the time, are alone sufficient to arouse grave suspicions that some unfair advantage was intended.

Add to these the further facts that W. F. Bramel is shown by all the evidence to have had the warmest affection for all his children; that his daughters are proven to have been worthy of his love and in need of his bounty; and that if he understood what he was doing and did it of his own volition, he was putting it out of his power to give them anything whatever; and it is difficult to believe that these conveyances were understandingly and willingly made.

This conclusion is strengthened by other facts in the record. The deed to the land recites that it is made in consideration that the grantees would pay a debt of $535 secured by a mortgage on the

land, and the further consideration that they would support him during life and pay his funeral expenses, and of indebtedness to them for services rendered in the accumulation of the land. The evidence fails to show any services rendered by the grantees after they attained their majority, in paying for the land, or that they performed any unusual amount of service for him at any time, but rather tends to show that they were his debtor after they became of age.

The deed to the personal property recites that it is made in order to make the sons equal to the daughters in the distribution of his estate. The evidence shows beyond dispute that no advancements, beyond a very small amount, had been made to either of the daughters. Instead of making all equal, the two sons get near $2,000 each, while the three daughters are not shown by the evidence in this record to have received all together one-fourth of that sum. It is true that James and William swear to large advancements to all the girls; but when required to state in detail in what those advancements consisted they wholly fail; and it is entirely apparent from their own testimony that no advancements, beyond a few dollars, were ever made to any one of them.

The evidence also shows that after the deeds were made and the notes assigned, the old gentleman repeatedly said that he intended to secure, or had secured to Mrs. Strode $1,000, and intended if he got well enough to get out, to buy a small parcel of land for Mrs. Glasscock, and have it secured to her. Yet at the time he made those declarations, if he knew what he had embraced in the deeds and assignments, and what estate he had at the date of their execution, he must have known he had not the means with which to do so.

He had no motive to put false recitals in the deeds, and if he did not know they were false in some respects, especially that in the deed of the personal property, he lacked capacity to make a valid disposition of his estate. If he knew they were false and yet executed the deeds with those statements in them, that fact would, in view of the state of his health, and the circumstances under which he acted, be convincing evidence that the deeds were not his voluntary act but influenced by a power he was unable to withstand.

We recognize in its fullest extent the absolute right of a parent of disposing mind to dispose of his property among his children in such way as his judgment or even his whims or caprices may dictate, but when an old, frail and sick man makes a grossly unequal distribution—one which is in conflict with the dictates of natural affection, with nothing in the relation between him and his children or in their

respective circumstances and conditions in life which seem to justify it, if the burden of showing affirmatively that he was capable and fully understood what he was doing is not cast upon those who assert such disposition, it is at least incumbent upon them to explain fully and clearly every circumstance tending to cast suspicions upon the fairness and candor of their own conduct. When under such circumstances as exist in this case, the conveyances relied upon contain upon their faces false recitals, the belief of which would incline the mind to execute such conveyances, the evidence that the disposition was fully understood and intended should be clear and convincing. *Harrell, et al., v. Harrell, et al.,* 1 Duvall 203.

The conveyances and assignments under which the appellees claim should be set aside, and an account should be taken of advancements; the appellees should be credited with any sums paid to or for W. F. Bramel, and for any balance due them they are entitled to a lien on the land. After ascertaining the amount of the estate and advancements, the five children of W. F. Bramel should be made equal, by the distribution and division.

Judgment *reversed,* and cause remanded for further proceedings in conformity with this opinion.

*E. C. Phister, for appellants.   Card & Alexander, for appellees.*